494 A.2d 976

**Michael BATES**

**v.**

**STATE of Maryland.**

**No. 1583, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

July 11, 1985.

M. Gordon Tayback, Baltimore, for appellant.

Valerie W. Loftin, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Kurt L. Schmoke, State's Atty. for Baltimore City and James Salkin, Asst. State's Atty. for Baltimore City, Baltimore, on brief), for appellee.

Argued before MOYLAN, WILNER and KARWACKI, JJ.

MOYLAN, Judge.

The appellant, Michael Bates, was convicted by a Baltimore City jury, presided over by Judge Edward J. Angeletti, of possession of heroin with intent to distribute. He was sentenced to a prison term of 20 years and a fine of $25,000. Upon this appeal, the merits of guilt or innocence are not before us. Neither are the Fourth Amendment merits of whether the search for and seizure of the contraband heroin satisfied Fourth Amendment standards of reasonableness. The sole issue is that of whether the appellant was even entitled to litigate those Fourth Amendment merits.

The appellant moved pretrial to suppress the evidence on Fourth Amendment grounds. The State raised a timely challenge to the appellant's standing to object. Upon that threshold question of standing, the hearing judge ruled that the appellant, as a passenger in the taxicab that was searched, had no Fourth Amendment standing to object. We reverse that ruling.

Surprisingly, there is an absolute dearth of case law dealing with this seemingly routine question of whether a person who hires a taxicab enjoys, for the period of his use and occupancy, any Fourth Amendment standing—an objectively recognized reasonable expectation of privacy—in the common area of that taxicab. Even while ultimately ruling with the appellant, we reject utterly his misplaced reliance on *Rios v. United States,* 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960). In *Rios,* to be sure, the passenger of a taxicab that was warrantlessly searched ultimately prevailed on the Fourth Amendment merits. The only issue before the Supreme Court in that 1960 decision, occurring as it did during the turbulent twelve-year interim between *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782, in 1949, and *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, in 1961, was the continuing viability of the so-called "silver platter doctrine." The issue of standing

did not arise in the remotest way and was never acknowledged or referred to even obliquely.[1]

The failure of *Rios* as supportive precedent, however, by no means portends a failure of compelling principles. The requirement, in a Fourth Amendment context, that a defendant have standing to object in order to litigate the possible suppression of evidence is but an instance of the broader requirement that there be "a live case or controversy" before courts will involve themselves in the resolution of contested issues. If the prospective litigant can satisfy the court that he is the aggrieved party—that the alleged violation was of his own Fourth Amendment right and not that of someone else—then it is his business whether his Fourth Amendment right was satisfied or violated. Standing is the threshold question of the entitlement to litigate the merits of the search and seizure.

Prior to 1960, it was necessary for a defendant whose standing was challenged to establish to the satisfaction of the court some proprietary or possessory interest in the place searched. In 1960, however, the case of *Cecil Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, dramatically liberalized the class of persons entitled to litigate the Fourth Amendment merits. It recognized a variety of derivative standing, whereunder the Fourth Amendment protection of the host devolved, to some greater or lesser extent, upon others who were legitimately upon the protected premises and could thereby claim through the host some measure of constitutional protection. *Cecil Jones* was, in turn, further refined by *Rakas v. Illinois*, 439

---

1. To the undying dismay of legal-methods professors, both the pro-standing justices in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and the anti-standing justices in *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), insisted on batting back and forth the facts of *Rios* as if standing had been an issue in that case. Despite these models, we are not persuaded to indulge in such an Orwellian revision of history, when every tenet of sound legal reasoning repudiates mere factual similarity as a source of legal authority on an issue that was never raised.

U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), which held that legitimate presence on the premises, though highly significant, was not an automatic touchstone for purposes of deciding Fourth Amendment standing. Instead of a "bright line formula," courts would look at the totality of circumstances and determine whether, under the formulation of *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), there was in that particular guest, licensee, or invitee on that particular occasion a reasonable expectation of privacy in that part of the premises actually subjected to the search.

Thus, neither *Cecil Jones*, where standing to contest the search of a residence was extended, nor *Rakas v. Illinois*, where standing to contest the search of an automobile was not extended, was an automatic "bright line formula" case. Standing rose or fell with the adequacy of the defendant's proof upon the issue. In *Cecil Jones*, the defendant was not a "mere guest." He established that his friend had given him permission to use the friend's apartment, that he had a key with which he admitted himself on the day of the search, that he was the only occupant of the apartment because the lessee was away for a period of several days, that he kept some of his clothes in the apartment, that he had slept in the apartment, and that he "had complete dominion and control over the apartment and could exclude others from it." *Rakas v. Illinois*, 439 U.S. at 149, 99 S.Ct. at 433.

In *Rakas v. Illinois*, by way of contrast, the defendants deliberately chose to rely upon their status as "mere guests" in the search of the automobile and failed to offer any further proof of a reasonable expectation of privacy on their parts. The critical lack in *Rakas v. Illinois* was not necessarily the lack of a reasonable expectation of privacy but rather the lack of proof of such expectation. The defendant, as the proponent, has, upon timely challenge, the burden of establishing standing; the State has no burden of establishing non-standing. *Rakas v. Illinois*, 439 U.S. at 131 n. 1, 99 S.Ct. at 424 n. 1.

In *Rakas*, the defendants "asserted neither a property nor a possessory interest in the automobile." 439 U.S. at 148, 99 S.Ct. at 433. The Supreme Court pointed out that the defendants had failed to sustain their burden of proof and that it did "not wish to be understood as saying that legitimate presence on the premises is irrelevant to one's expectation of privacy, but it cannot be deemed controlling." *Id.* With respect to the search of the glove compartment and an area beneath the seat involved in that case, the Supreme Court reasoned that the defendants would have failed to establish standing even if a residence had been involved instead of an automobile:

> "But here petitioners' claim is one which would fail even in an analogous situation in a dwelling place, since they made no showing that they had any legitimate expectation of privacy in the glove compartment or area under the seat of the car in which they were merely passengers. Like the trunk of [an] automobile, these are areas in which a passenger qua passenger simply would not normally have a legitimate expectation of privacy."

439 U.S. at 148–149, 99 S.Ct. at 433.

*Rakas* by no means held that a passenger in an automobile for a three-week cross-country trip, with his luggage in the trunk, might not have a reasonable expectation of privacy in that trunk; it merely held that he would have to prove such an additional fact bearing on his reasonable expectation rather than rely upon his status as a mere passenger. A teenaged passenger in his family's automobile might well have a reasonable expectation of privacy, but he would be required to prove the additional dimension.

In the present case, unlike *Rakas*, there was no failure of proof on the appellant's part of his reasonable expectation of privacy. The appellant was no mere passenger in an automobile, but the hirer of a taxicab. That might well be enough to establish even traditional proprietary or possessory standing by pre-1960 standards, but that is a point we do not have to decide. The appellant established that it was he who hailed and hired the taxicab that was ultimately

searched. His friend and fellow passenger, James Elfe, occupied the back seat of the taxicab, and the appellant rode in the front seat. Although there was evidence that Mr. Elfe would ultimately pay the fare, the directions to the taxicab driver were given by the appellant. The appellant knew Baltimore, whereas Mr. Elfe was from New York and unfamiliar with the area. It is clear that the two passengers together hired the taxicab, and there is no question before us as to the division of control between the two.

The appellant and his fellow passenger, as a consideration for the contracted payment of the fare, assumed certain incidents of control beyond the mere incidents that would come with the status of a mere passenger or casual hitchhiker. Although they might not be able to forbid the taxicab driver to stop at a gasoline station and refill the fuel tank, they were in a position to name the destination and to choose the route. *Rakas* pointed out, at 439 U.S. 144 n. 12, 99 S.Ct. at 431 n. 12, that "[o]ne of the main rights attaching to property is the right to exclude others" and that one who enjoys such a right "will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude." With respect to the right to exclude others, it is not without significance that a regulation of the Public Service Commission, COMAR 20.90.02.17B(1), provides, with respect to multiple passengers being picked up at railroad stations and other public places:

"[A] passenger who has engaged a cab may not be compelled to share the vehicle with others if unwilling to do so. Drivers may not refuse service in order to effect more profitable grouping."

With respect to a taxicab driver picking up additional passengers en route, § B(2) goes on to provide:

"Solicitation of others while enroute to the destination of passengers or parties initially occupying the cab is prohibited."

There is a significant measure of control in the hirer of a taxicab that is not possessed by a mere gratuitous passen-

ger in an automobile. If the hirer of a taxicab has no reasonable expectation of privacy, what of the lessee of a limousine with a hired chauffeur?

■ The State argues strenuously that there is still a significant measure of residual control in the taxicab driver, but that is quite beside the point. Involved is not the expectation of the passenger *vis-à-vis* the driver but *vis-à-vis* the rest of the world. The Fourth Amendment protection of one co-owner or co-tenant may frequently be defeated by the wishes and actions of another co-owner or co-tenant. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). That is not the situation before us, however. The taxicab driver in this case did not invite the police into the taxicab. We are not arbitrating the rights, powers, authority, or obligations of the taxicab driver or the passenger *vis-à-vis* each other. Although the Fourth Amendment expectations of the passenger might (we do not decide) have been defeasible at the hands of the taxicab driver, they were not compromised *vis-à-vis* the police.

The State relies almost exclusively on the *Rakas* case and that reliance is misplaced. In *Rakas,* the search was of a glove compartment and of an area beneath the seat of the car wherein nothing was initially visible. The *Rakas* Court itself stressed that, "[l]ike the trunk of [an] automobile, these are areas in which a passenger qua passenger simply would not normally have a legitimate expectation of privacy." 439 U.S. at 148–149, 99 S.Ct. at 433. In the present case, the stopping officer shined his flashlight directly on the appellant and observed the appellant take a manila envelope out of his hand, throw it to the floor, and attempt to kick it under the car seat. This was the very envelope that was seized and searched.

The dissenting justices in *Rakas* attempted to rely on the *Rios* case, as reinterpreted by *Katz,* for the proposition that

a passenger should have standing in an automobile. The majority initially pointed out that standing had not been, of course, an issue in the *Rios* case. It then went on, moreover, to distinguish *Rios* factually, pointing out, at 439 U.S. 149 n. 16, 99 S.Ct. at 433 n. 16:

> "Additionally, the facts of that case are quite different from those of the present case. Rios had hired the cab and occupied the rear passenger section. When police stopped the car, he placed a package he had been holding on the floor of the rear section. The police saw the package and seized it after defendant was removed from the cab."

Factually, the present case is virtually indistinguishable from *Rios*. Although we disdain any reliance on *Rios*, simply as a matter of craftsmanship, the *Rakas* majority relied on *Rios* in this regard and it is, after all, their interpretation of the Fourth Amendment, not ours, that is controlling.[2]

■ The fountainhead for the very notion of "reasonable expectation of privacy" as the way of determining whether there is a Fourth Amendment protection, of course, is *Katz v. United States, supra*. Its analogy to the present case is a strong one. There, the constitutionally protected area was a public telephone booth. The owner of the booth was Pacific Bell and not Charlie Katz. When Charlie Katz, however, entered the booth, deposited his 15 cents, and closed the door, it became, for the period of that brief use and occupancy, a constitutionally protected area as to him, a place in which he had a reasonable expectation of privacy. *A fortiori*, one who hires a taxicab and contracts to pay a fare well in excess of 15 cents, similarly acquires, for the period of his use and occupancy, a reasonable expectation of privacy. The case will have to be remanded for purposes of affording the appellant the suppression hearing, before the

---

2. Let it be clear that any disagreement we feel is not with the legal principle for which *Rios* is cited as authority, but only with the use of *Rios* as the authority for the principle.

judge, to which he was constitutionally entitled. The fact that the appellant prevails on the threshold issue of standing intimates nothing, of course, with respect to the ultimate Fourth Amendment merits. It simply entitles him to have those Fourth Amendment merits litigated.

It but remains for us to consider the scope of the remand. If it should be determined at the suppression hearing on the Fourth Amendment merits that the taxicab in question was unconstitutionally searched, the judgment of conviction will have to be vacated. If, upon the other hand, it should be determined that the search of the taxicab was constitutionally proper, that means that the trial upon the merits was free from error. To reverse a conviction that was properly arrived at in a trial completely free of error would be an absurdity. The Fourth Amendment merits litigated at a suppression hearing are a matter for the trial judge alone, dealing only with the admissibility of the evidence, and not a concern of the jury in the remotest way.

Maryland Rule 1071 a provides:

"If it shall appear to this Court that the substantial merits of a case will not be determined by affirming, reversing or modifying the judgment from which the appeal was taken, or that the purposes of justice will be advanced by permitting further proceedings in the cause, either through amendment of the pleadings, introduction of additional evidence, or otherwise, then this Court, instead of entering a final order affirming, reversing or modifying the judgment from which the appeal was taken, may order the case to be remanded to the lower court. Upon remand to the lower court, such further proceedings shall be had by amendment of the pleadings, introduction of additional evidence, making of additional parties, or otherwise, as may be necessary for determining the action upon its merits as if no appeal had been taken and the judgment from which the appeal was taken had not been entered; provided, however, that the order entered by this Court in remanding said case, and the opinion of this Court on which said order is passed, shall

be conclusive as to the points finally decided thereby. In such an order remanding a case, this Court will express the purpose for so remanding and in its opinion filed with said order will determine all questions which may have been properly presented."

As logically compelling as this procedure of limited remand is, some doubt was cast upon its availability by the 1972 decision of *Gill v. State,* 265 Md. 350, 289 A.2d 575. *Gill* properly precluded recourse to the limited remand in criminal cases where the question in issue was a mixed one of law and fact, in part an issue for the judge alone in making a legal ruling (such as a ruling on the admissibility of evidence) but also in part one for the ultimate fact finder in weighing even that evidence which was properly admitted. The source of confusion was not *Gill* itself, properly limited to its own facts and circumstances, but a prevalent tendency to read the *Gill* decision overbroadly as forbidding all limited remands in criminal cases, even where the subject matter to be determined upon remand had never been before the fact finder and was not properly a subject for consideration by the fact finder.

Fortunately, that confusion was dissolved in 1981 by the well reasoned decision of the Court of Appeals in *Wiener v. State,* 290 Md. 425, 430 A.2d 588. *Wiener* drew a clean and logical distinction between legal rulings which can be examined or reexamined in a vacuum and mixed questions of law and fact that are so inextricably interwoven as to preclude a separating of the strands. The excellent opinion of Judge Rodowsky for the Court reasoned, at 290 Md. 437–438, 430 A.2d 588:

"In *Gill v. State,* 265 Md. 350, 289 A.2d 575 (1972) we addressed the use of Rule 1071 a, the companion of Rule 871 a, to effect a limited remand in a criminal case. The Court of Special Appeals had remanded a non-jury case for redetermination of the voluntariness of a confession. We assumed that Rule 1071 a could be invoked in criminal causes and commented that 'it may be suitable to correct procedures subsidiary to the criminal trial....' But we

held that a restricted remand 'can never be utilized to rectify prejudicial errors committed during the trial itself' and that the 'admissibility of a confession is always an integral part of a trial.' *Id.* at 357, 289 A.2d at 579. Here, the hearing to determine the facts underlying Wiener's motion claiming denial of the right to the effective assistance of counsel was collateral to the criminal trial itself. *Unlike the issue relating to the voluntariness of the confession in Gill, evidence given in support of, or in opposition to, Wiener's motion to dismiss is not presented again in the course of the trial for consideration with all of the evidence bearing on guilt or innocence.* Wiener's non-jury case presents the type of an issue which meets the criteria suggested in *Gill* for a limited remand in a criminal case and we hold that Rule 871 a may be applied.

Thus, we shall neither affirm nor reverse the judgment of conviction from which this appeal was taken, but the matter will be remanded for the limited purpose of conducting a new hearing on the issue of the claimed violation of the right to counsel." (Emphasis supplied).

Reprieved from the overbroad reading of *Gill*, we seized upon *Wiener v. State* to order a limited remand in *Butler v. State*, 55 Md.App. 409, 462 A.2d 1230 (1983). We reasoned that it was "the clear distillation of *Gill v. State* ... and *Wiener v. State* ... that if 'the purposes of justice will be advanced by permitting further proceedings in the cause,' a limited remand is both permitted and appropriate. Maryland Rule 1071a." 55 Md.App. at 433, 462 A.2d 1230. We summarized the collective holdings:

"The two cases distinguished between the limited remand that 'may be suitable to correct procedures subsidiary to the criminal trial' and the limited remand that 'can never be utilized to rectify prejudicial errors committed during the trial itself.' *Gill v. State, supra,* at 265 Md. 357 [289 A.2d 575]; *Wiener v. State, supra,* at 290 Md. 437–438 [430 A.2d 588]. In *Gill v. State,* the error concerned the

trial court's ruling on the voluntariness of a confession. Since it occurred in the course of the trial itself and since it impacted not only on evidentiary admissibility but also on evidentiary weight, a limited remand was held to be improper and a full new trial was called for. In *Wiener*, as in the case before us, the failure to make an adequate ruling was with respect to a defendant's right 'collateral to the criminal trial itself.' 290 Md. at 438 [430 A.2d 588]."

55 Md.App. at 433–434, 462 A.2d 1230.

In *Jones v. State*, 56 Md.App. 101, 466 A.2d 895 (1983), by way of contrast, the issue that had not been properly litigated in the first instance involved questions of fact that could have had an impact upon the jury in its fact-finding capacity. Judge Alpert there reasoned for the Court:

"A limited remand 'may be suitable to correct procedures subsidiary to the criminal trial' but it 'can never be utilized to rectify prejudicial errors committed during the trial itself.' *Gill v. State*, 265 Md. 350, 357, 289 A.2d 575 (1972). In *Gill*, the trial court made an erroneous ruling on the voluntariness of a confession. Since this error occurred in the course of the trial and impacted on both the evidentiary admissibility as well as the evidentiary weight, a limited remand was improper. *Id.* at 357–60, 289 A.2d 575. *Compare with Wiener v. State*, 290 Md. 425, 430 A.2d 588 (1981) (erroneous ruling on appellant's motion to dismiss curable by limited remand because evidence supporting or opposing motion was collateral to the criminal trial). *See also Butler v. State*, 55 Md.App. 409, 433–34, 462 A.2d 1230 (1983) (limited remand appropriate to determine whether claimed violation of an agreement by police not to prosecute should result in dismissal of action). As the trial court's failure to require the State to justify its non-disclosure could have produced 'prejudicial errors committed during the trial itself,' such error could not be characterized as collateral to the trial."

56 Md.App. at 113–114, 462 A.2d 1230.[3]

██ The substance of what should be done is clear. Ironically, only the form is unclear. The framing of a mandate becomes convoluted when contingencies are involved. Both Rule 1071 a itself and the model of *Wiener* give us the guidelines. Rule 1071 a provides that in cases of limited remand, "such further proceedings shall be had . . . as may be necessary for determining the action upon its merits *as if* no appeal had been taken and *the judgment from which the appeal was taken had not been entered.*" (Emphasis supplied). The final judgment of guilty in this case, based upon the jury's verdict of guilty, is contingently affirmed pending the result upon remand of the Fourth Amendment suppression hearing. If at that hearing it should be determined that the search was reasonable under the Fourth Amendment and that the physical evidence was properly before the jury, it will mean that no constitutional right of the defendant was violated when the physical evidence was admitted. "If the court finds no violation occurred, the judgment of conviction will stand and [the appellant] may appeal the trial court's determination." *Warrick v. State,* 302 Md. 162, 174, 486 A.2d 189 (1985). *See also Mahammitt v. State,* 299 Md. 82, 472 A.2d 477 (1984); *Grant v. State,* 299 Md. 47, 472 A.2d 459 (1984); *Pennington v. State,* 299 Md. 23, 472 A.2d 447 (1984).

If, on the other hand, it should be determined that the search was unconstitutional and that the physical evidence should never have been admitted, the trial judge will, as one of the alternatives in *Wiener* directed, award the appellant a new trial. *See also Warrick v. State, supra,* at 302 Md. 174, 486 A.2d 189; *Pennington v. State, supra,* at 299 Md. 30–31, 472 A.2d 447. The awarding of a new trial would be the appropriate mechanism for the judge to override the jury's verdict, since the hindsight then available through

---

**3.** The bottom line is beautiful in its profound simplicity. Where the limited and more economical remand is feasible, it will be resorted to; where it isn't, it won't.

the mandated after-the-fact suppression hearing would have revealed that the trial had been fatally infected by the erroneous admission of the physical evidence.

Our mandate essentially tracks the model provided by *Wiener*, 290 Md. at 451, 430 A.2d 588.

CASE REMANDED, WITHOUT AFFIRMANCE OR REVERSAL, TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR THE PURPOSE OF CONDUCTING A SUPPRESSION HEARING ON THE FOURTH AMENDMENT MERITS.

THE JUDGMENT OF CONVICTION REMAINS IN EFFECT PENDING FURTHER PROCEEDINGS.

COSTS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.